Michael Klein
SMITH, ROBERTSON, ELLIOTT, GLEN,
KLEIN & BELL, L.L.P.
221 West Sixth Street, Suite 1100
Austin, TX 78701
Telephone: (512) 225-5800
Facsimile: (512) 225-5838

SCHIFFRIN BARROWAY
 TOPAZ & KESSLER, LLP
Lee D. Rudy
Michael C. Wagner
Alison K. Clark
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**FILED**

MAR 1 9 2007

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY CLERK

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| VLADIMIR GUSINSKY, Derivatively on Behalf of Nominal Defendant CIRRUS LOGIC, INC., )<br><br>Plaintiff, )<br><br>vs. )<br><br>DAVID D. FRENCH, HENRY M. JOSEFCZYK, ERIC J. SWANSON, ROBERT F. DONOHUE, RONALD K. SHELTON, ARTHUR SWIFT, SUHAS S. PATIL, PATRICK V. BOUDREAU, TERRY LEEDER, ROBERT V. DICKINSON, ROBERT W. FAY, JASON CARLSON, CRAIG H. ENSLEY, ROBERT A. KROMER, STEVEN D. OVERLY, GERALD R. GRAY, CHARLES KEITH ESSENCY, STEVEN E. THOMPSON, WOODY PAUL ENDSLEY, STEPHANIE LUCIE, JOHN L. MELANSON, CLARK WALTER JERNIGAN, MATTHEW R. PERRY, KEITH E. CHENEY, THOMAS MERRILL DILLE, D. JAMES GUZY, ROBERT H. SMITH, WALDEN C. RHINES, | Case No. **A07CA212 SS**<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

WILLIAM D. SHERMAN, JASON P. RHODE,       )
and MICHAEL L. HACKWORTH,                 )
                                          )
                                          )
                Defendants,               )
                                          )
      and                                 )
                                          )
CIRRUS LOGIC, INC.,                       )
                                          )
                                          )
                Nominal Defendant.        )
_____)

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of Nominal

Defendant Cirrus Logic, Inc. ("Cirrus" or the "Company") against certain members of its Board

of Directors (the "Board") and certain of its executive officers seeking to remedy defendants'

breaches of fiduciary duties, unjust enrichment, statutory violations, and other violations of law.

2.     For at least five years, all of Cirrus's directors, together with its top officers,

engaged in a secret scheme to grant undisclosed "in-the-money"[1] stock options to themselves

and others by backdating stock option grants to coincide with historically low closing prices of

Cirrus's common stock.

3.     A stock option is the right to purchase a stock for a specified period of time at a

fixed price, called the "exercise price" or "strike price."  The exercise price is generally fixed to

the market price of the stock on the date of grant.  If the stock's market price exceeds the

exercise price, the option holder may exercise the stock option, by purchasing the stock from the

---

[1] "In-the-money" refers to when the exercise price of an option is below the market price of the underlying stock.

Company at the exercise price, and resell it at the higher market price, profiting from the difference.

4.      When the grant date of a stock option is manipulated to an earlier date on which the stock closed at a lower price - *i.e.* when the stock option is "backdated" - the grantee pays less for the stock and the corporation, the counterparty to the stock option grant, receives less when the stock option is exercised.  When stock options are backdated in this manner for the benefit of insiders (as they were in this case), the stated purpose behind a stock option plan – to strengthen the Company's ability to retain key employees and motivate such employees to remain focused on long-term stockholder value performance – is undermined to the detriment of the Company and its shareholders, because the granted stock options are already "in-the-money" at the time they are granted.

5.      By engaging in this scheme, the Individual Defendants (as defined herein) were able to conceal that Cirrus was materially under-reporting the Company's compensation expenses and was materially overstating the Company's net income and earnings for at least fiscal years 1999 through 2006.  In addition to being unjustly enriched by the mere receipt of such backdated options, certain of the Individual Defendants also collectively realized millions of dollars in illicit proceeds through the exercise of these illegally backdated options grants and subsequent sales of Cirrus stock.  By contrast, Cirrus has suffered, and will continue to suffer, significant financial and non-monetary damages and injuries, several of which were identified in a report issued by the Center for Financial Research and Analysis on May 16, 2006, entitled "Options Backdating – Which Companies Are at Risk?":

- SEC investigation risk – The SEC has begun information investigations at many companies in recent months and has also begun to call for improved disclosures around all areas of executive compensation.

- Accounting restatement risk – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

- Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

- Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholder, the reputation of management (and the related stock premium for superior management) could take a hit.

6.      The Individual Defendants misrepresented facts presented in the Company's proxy statements soliciting action by shareholders, and in press releases and documents filed with the Securities and Exchange Commission ("SEC"), specifically quarterly and year-end reports.  For example, since at least June 22, 1999, notwithstanding their knowing and intentional backdating of stock option grants to reflect lower exercise prices than the fair market value of the stock on the grant date, the Individual Defendants (as defined herein) falsely represented that the Company, through its stock option plans, issued stock options at an amount which was "equal to the fair market value of the Company's Common Stock on the date of grant."

7.      Cirrus shareholders routinely relied upon the false proxy statements issued by the Company and voted for the Company's stock option plans under which the Individual Defendants manipulated and backdated stock option grants in order to enrich the Option Recipient Defendants (as defined herein) at the expense of the Company and its shareholders.

8.      The Individual Defendants knew, but failed to disclose, that they had engaged in a practice of backdating stock option grants to the Option Recipient Defendants in a manner designed to create immediate and risk-free profits for such recipients in direct contravention of the Company's stated and shareholder-approved stock option plans and proxy statements filed with the SEC.  Furthermore, the Individual Defendants knew that because the Company had not

taken a compensation expense for backdated options, Cirrus's reported earnings and expenses were false and misleading and not in compliance with the Generally Accepted Accounting Principles ("GAAP"). Thus, by falsifying the date on which options were granted, the Individual Defendants materially understated Cirrus's expenses and overstated its income and falsely represented that it had not incurred any expenses for option grants.

9.      On March 2, 2007, the Individual Defendants finally were forced to *admit* that they had participated in this unlawful scheme, stating that "the Board of Directors has concluded that the accounting measurement dates for certain stock options granted between January 1, 1997, and December 31, 2005, differ from the recorded measurement dates previously used for such awards." As a result, the Company has announced that it will be forced to restate its financial results for fiscal years 2001 through 2006 and the first quarter of 2007, during which time the Company under-reported its compensation expenses "*in the range of $22 to $24 million*." Further, as a result of its internal investigation, the Company's longtime President and Chief Executive Officer, ("CEO") Defendant David D. French ("French") resigned. The Company's internal investigation revealed that Defendant French was "significantly involved in the grant approval process for certain grants and that he influenced the grant process with a view toward the stock price, and therefore the selection of grant dates, through his control over how quickly or slowly the process was completed."

10.     In sum, as alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Cirrus, the Individual Defendants colluded with one another to:

      a.      improperly backdate several grants of Cirrus stock options to Cirrus's former President and CEO French and several other Cirrus executives, in violation of the Company's shareholder-approved stock option plans;

      b.      improperly record and account for the backdated stock options, in

> violation of GAAP;
>
> c.    improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)");  and
>
> d.    produce and disseminate to Cirrus shareholders and the market false financial statements and other false SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

11.    As a result of the Individual Defendants' egregious misconduct, Cirrus has sustained millions of dollars in damages.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.    Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the Individual Defendants either resides in or maintains executive offices in this district, and the Individual Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

### Plaintiff

14.    Plaintiff Vladimir Gusinsky is, and was at all relevant times, a shareholder of Nominal Defendant Cirrus.

**Nominal Defendant**

15.     Nominal Defendant Cirrus is a Delaware corporation with its principal executive offices located at 2901 Via Fortuna, Austin, Texas 78746.  According to its public filings, Cirrus develops high-precision, analog and mixed-signal integrated circuits for a broad range of consumer and industrial markets.

**Option Recipient Defendants**

16.     Defendant French served as the Company's President from June 1998 to his resignation in March 2007, as CEO from February 1999 to his resignation in March 2007 and as a director of the Company from 1999 to his resignation in March 2007.  French also served as the Company's Chief Operating Officer ("COO") from June 1998 to February 1999.

17.     Defendant Henry M. Josefczyk ("Josefczyk") served as the Company's Senior Vice President, Worldwide Sales from November 1997 to February 2000.

18.     Defendant Eric J. Swanson ("Swanson") served as the Company's Vice President and Chief Technical Officer from March 1998 to at least 1999.

19.     Defendant Robert F. Donohue ("Donohue") served as the Company's Vice President, Chief Legal Officer, General Counsel and Secretary from May 1996 to in or about 2000.

20.     Defendant Ronald K. Shelton ("Shelton") served as the Company's Chief Financial Officer ("CFO"), Treasurer and Vice President, Finance from April 1997 to 1999 and as Vice President, Finance and Corporate Controller from September 1996 to April 1997.

21.     Defendant Arthur Swift ("Swift") served as Vice President and General Manager of the Company's Optical Storage Division from March 1999 to March 2000, as Vice President and General Manager of the PC Products Division from May 1998 to March 1999 and as Vice

President, Product Marketing from October 1996 to May 1998.

22.     Defendant Suhas S. Patil ("Patil"), a founder of the Company, has served as a director since 1984 and as Chairman Emeritus of the Company since July 1997. Patil also served as the Chairman of the Board from 1984 to July 1997, as Executive Vice President, Products and Technology from March 1990 to April 1997 and as Vice President, Research and Development from 1984 to March 1990.

23.     Defendant Patrick V. Boudreau ("Boudreau") served as the Company's Senior Vice President, Human Resources from October 1996 to 2000.

24.     Defendant Terry Leeder ("Leeder") has served as the Company's Senior Vice President, Business Development since December 2004. Leeder also served as the Company's Vice President of Worldwide Sales from June 1999 to August 2002, as Vice President of Sales and Marketing from August 2002 to September 2002 and as Senior Vice President of Sales and Marketing from September 2002 to December 2004.

25.     Defendant Robert V. Dickinson ("Dickinson") served as Vice President and General Manager of the Company's Optical Storage Division from August 1999 to April 2001. From December 1992 to August 1999, Dickinson served in various capacities, including as Vice President, Japan Business Development, as President, Cirrus Logic K.K., as President, Graphics Company and as Vice President, Quality and Customer Satisfaction.

26.     Defendant Robert W. Fay ("Fay") served as the Company's Vice President and CFO from December 2000 to October 2001, as Vice President, CFO, Treasurer and Secretary from April 2000 to December 2000 and as Vice President of Finance from November 1999 to April 2000.

27.     Defendant Jason Carlson ("Carlson") served as the Company's Vice President and

General Manager, Crystal Products Division from May 2001 to at least 2002 and as Vice President and General Manager, Consumer Audio Products Division from January 2000 to May 2001.

28. Defendant Craig H. Ensley ("Ensley") served as the Company's Senior Vice President, General Manager, Embedded Products from December 2004 to in or about June 2006. Ensley also served as the Company's Senior Vice President of Engineering from September 2002 to June 2006, as Vice President of Corporate Marketing from March 1999 to September 2002, as Vice President and General Manager, Flat Panel Electronics Division from April 1997 to February 199 and as Vice President and General Manager of the Computer Products Division of Crystal Semiconductor Corporation, a subsidiary of the Company, from 1993 to 1997.

29. Defendant Robert A. Kromer ("Kromer") has served as the Company's Vice President of Worldwide Sales since January 2003. Since he joined the Company in 1998, Kromer served in various capacities, including as Vice President, Marketing from July 2002 to January 2003, as Vice President and General Manager, Optical Products Division from April 2001 to July 2002 and as Vice President and General Manager, Mass Storage Division from March 2000 to April 2001.

30. Defendant Steven D. Overly ("Overly") served as the Company's CFO from April 2002 to July 2003, as Secretary from December 2000 to July 2003 and as Senior Vice President, Human Resources and General Counsel from October 2000 to July 2003.

31. Defendant Gerald R. Gray ("Gray") has served as the Company's Senior Vice President of Worldwide Operations since September 2002. Gray also served as Vice President of Worldwide Operations from April 2000 to September 2002 and as Vice President of Domestic Operations from June 1998 to April 2000.

32.     Defendant Charles Keith Essency ("Essency") served as the Company's Vice President and General Manager; Computer Audio Products Division from March 2000 to at least September 2000 and as Vice President and General Manager of the Company's Crystal Audio Division from July 1999 to March 2000.

33.     Defendant Steven E. Thompson ("Thompson") served as the Vice President and Treasurer of the Company from March 2001 to at least October 2001, as Treasurer and Senior Director from May 2000 to March 2001 and as Senior Director of Tax from January 2000 to May 2000.

34.     Defendant Woody Paul Endsley ("Endsley") served as the Company's Controller in at least 2000.

35.     Defendant Stephanie Lucie ("Lucie") served as the Company's Vice President, Associate General Counsel and Assistant Secretary from February 2001 to December 2003.

36.     Defendant John L. Melanson ("Melanson") served in various capacities with the Company from July 1999 to at least 2004, including as a technology advisor and as the Company's Vice President, Technology from 2001 to at least 2004.

37.     Defendant Clark Walter Jernigan ("Jernigan") served in various positions with the Company from 1997 to 2001, including as the Director of Engineering, Vice President and General Manager of the Company's communications division and Vice President of New Business Development.

38.     Defendant Matthew R. Perry ("Perry") served in various capacities with the Company from December 1995 to April 2002, including as Vice President and General Manager of the Embedded Processors Division from May 1998 to April 2002, as Vice President, Strategic Marketing from January 1998 to May 1998, as Senior Director, Engineering from May 1997 to

January 1998, as Director, Marketing from August 1996 to May 1997 and as Manager, Strategic Planning and Business Development from December 1995 to August 1996.

39.     Defendant Keith E. Cheney ("Cheney") has served as the General Manager of the Company's Embedded Products Division since June 2005.   Cheney also served as the Company's Vice President for Marketing for the Embedded Products Division from March 2005 to June 2005 and served in various capacities with the Company from 1995 to 2000.

40.     Defendant Thomas Merrill Dille ("Dille") served as the Company's Vice President of Data Acquisition in at least 2001.

41.     Defendant Jason P. Rhode ("Rhode") has served as the Company's Vice President, General Manager, Mixed Signal Audio Products, since December 2004.  Since he joined the Company in July 1995, Rhode served in various capacities, including as Director of Marketing for analog and mixed signal products from November 2002 to November 2004.

42.     Collectively, defendants French, Josefczyk, Swanson, Donohue, Shelton, Swift, Patil, Boudreau, Leeder, Dickinson, Fay, Carlson, Ensley, Kromer, Overly, Gray, Essency, Thompson, Endsley, Lucie, Melanson, Jernigan, Perry, Cheney, Rhode and Dille are referred to herein as the "Option Recipient Defendants."

### Director Defendants

43.     Defendant D. James Guzy ("Guzy") has served as a director of the Company since 1984 and as a member of the Audit Committee of the Board ("Audit Committee") since fiscal 2001.  Guzy also served as a member of the Compensation Committee of the Board ("Compensation Committee") from fiscal 1997 to fiscal 2000.

44.     Defendant Robert H. Smith ("Smith") has served as a director of the Company since 1990 and as a member of the Compensation Committee and the Audit Committee since at least fiscal 1995.

45.     Defendant Walden C. Rhines ("Rhines") has served as a director of the Company since 1995, as a member of the Compensation Committee since fiscal 1996 and as member of the Audit Committee since fiscal 2002.

46.     Defendant Michael L. Hackworth ("Hackworth"), a founder of the Company, has served as a director of the Company since 1985 and as Chairman of the Board since July 1997. Hackworth has also served as the Company's Acting President and CEO since Defendant French's resignation on March 7, 2007.  Hackworth served as a member of the Compensation Committee from fiscal 2001 to fiscal 2004.  Hackworth also served as the Company's CEO from January 1985 to February 1999 and as President from January 1985 to June 1998.

47.     Defendant William D. Sherman ("Sherman") has served as a director of the Company since 2001 and as a member of the Compensation Committee since fiscal 2002.

48.     Collectively, defendants Patil, Guzy, Smith, Rhines, Hackworth and Sherman are referred to herein as the "Director Defendants."

**Individual Defendants**

49.     Collectively, the Option Recipient Defendants and the Director Defendants are referred to herein as the "Individual Defendants."

**DUTIES OF THE DEFENDANTS**

50.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good

faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

52.     To discharge their duties, the Individual Defendants as the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

> a.     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;
>
> b.     exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;
>
> c.     exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other

financial information concerning the financial condition of the Company; and

    d.    exercise good faith in ensuring  that the Company's financial statements were prepared in accordance with GAAP; and

    e.    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

53.    The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

    (1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

    (2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

        (a)    transactions are executed in accordance with management's general or specific authorization; and

        (b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

54.    Cirrus's Audit Committee Charter provides that the Audit Committee shall be responsible to, among other things:

    o    Review with management and the independent auditors the financial information and the Management's Discussion and Analysis proposed to be included in each of the Company's Quarterly Reports on Form 10-Q prior to their filing.  The Chair may represent the Committee for purposes of this review;

o      Review before release the unaudited interim financial results in the Company's quarterly earnings release; and

o      Review with management and the independent auditors, at the completion of the annual audit, the audited financial statements and the Management's Discussion and Analysis proposed to be included in the Company's Annual Report on Form 10-K prior to its filing and provide or review judgments about the quality, not only the acceptability, of accounting principles, such other matters required to be discussed with the independent auditors under generally accepted auditing standards. Based on such review and discussions, the Committee will consider whether it will recommend to the Board of Directors that the financial statements be included in the Company's Annual Report on Form 10-K.

## FACTUAL ALLEGATIONS

55.     Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1996 Stock Option Plan (the "1996 Plan"), the exercise price of the options "shall be no less than 100% of the Fair Market Value per Share on the date of grant," where fair market value is defined as "as of any date, … the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such exchange or system for the day of determination." The 1996 Plan did not provide for any discretion pursuant to which any director could contravene the shareholder approved plan.

56.     Pursuant to Accounting Principles Board ("APB") Opinion No. 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

57.     Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation

committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

58.    From 1998 to 2002, the Compensation Committee, which, according to the Company's 1999-2003 proxy statements, "review[ed] and approve[d] salaries and other matters relating to executive compensation, and administer[ed] the Company's employee stock purchase plan and stock option plans, including reviewing and granting stock options to executive officers and other employees," with the knowledge and approval of the other members of the Board, knowingly and deliberately violated the terms of the 1996 Plan, APB 25 and Section 162(m) by backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Cirrus's stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of the backdated options.

59.    The members of the Board who were not on the Compensation Committee had actual knowledge of the backdating and knew that it violated the terms of the 1996 Plan as they knew that the dates on which they were meeting did not correspond to the dates on which grants were purportedly being made.  In fact, defendants Hackworth, Patil, Rhines, Smith and Guzy initially adopted the 1996 Plan on May 21, 1996 and submitted the 1996 Plan for shareholder approval at the 1996 Annual Meeting in the Company's proxy statement filed with the SEC on June 12, 1996.  Thus, these Director Defendants knew that the backdating of options contravened the terms of the 1996 Plan which required the exercise price to be no less than 100% of the fair

market value of the stock price on the date of the grant and also that the 1996 Plan did not allow for discretion to contravene the express terms of the 1996 Plan. In addition, these Board members also knew that the use of backdated option grants violated ABP 25 and Section 162(m). All of the members of the Board knew that the public statements that the Company followed APB 25 and granted options with exercise prices equal to the fair market value of Cirrus stock on the date of grant were false because the grants were not approved as required on the dates that they met and were, in fact, backdated. The entire Board knowingly and deliberately approved the backdating scheme with knowledge of its consequences, e.g., its effects on Cirrus's financial statements.

60.     As Defendants recently admitted: "the Board of Directors has concluded that the accounting measurement dates for certain stock options granted between January 1, 1997, and December 31, 2005, differ from the recorded measurement dates previously used for such awards."

**Fiscal 1999 Option Grants**[2]

61.     The Individual Defendants' backdating was particularly egregious as to the stock options purportedly granted to Company executives, including five of the Company's top six most highly compensated executives, on October 8, 1998 at an exercise price of $5.875 – *the lowest closing price for Cirrus common stock for the entire fiscal year*. Indeed, following the purported grant date, the price of Cirrus common stock increased to $8.13 – *a 38.3% increase in just ten trading days*, as demonstrated below:

---

[2] Fiscal year 1999 ended on March 27, 1999.

**Fiscal Year 1999**



| Purported Grant Date | Name | Exercise Price | Number of Options[3] |
|---|---|---|---|
| 10/8/98 | French | $5.875 | 43,750 |
| | Josefczyk | $5.875 | 35,000 |
| | Swanson | $5.875 | 40,000 |
| | Donohue | $5.875 | 36,500 |
| | Shelton | $5.875 | 74,000 |
| | Dickinson | $5.88 | At least 10,000 |

## Fiscal Year 2000 Option Grants[4]

62.      During fiscal year 2000, the Individual Defendants purportedly granted options to

Company executives, including three of the Company's most highly compensated executives, on

June 3, 1999 at an exercise price of $7.125, which was also dated to coincide with one of

---

[3] Where the total number of options is unknown, *i.e.*, where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

[4] Fiscal year 2000 ended on March 25, 2000.

***Cirrus's lowest closing prices of the entire fiscal year***.  Indeed, ten trading days following the

purported grant date, the price of Cirrus's stock increased to $9.75 – ***a 36.8% increase***, as

demonstrated in the following graph:

### Fiscal Year 2000



| Purported Grant Date | Name | Exercise Price | Number of Options[5] |
|---|---|---|---|
| 6/3/99 | French | $7.125 | 75,000 |
| | Swift | $7.125 | 37,500 |
| | Patil | $7.125 | 24,000 |
| | Perry | $7.13 | At least 12,500 |
| | Cheney | $7.125 | At least 1,875 |
| | Gray | $7.13 | At least 2,750 |
| | Dickinson | $7.13 | At least 10,000 |
| | Boudreau | $7.125 | At least 1,000 |

---

[5] Where the total number of options is unknown, *i.e.*, where the phrase "at least" is utilized, the stock
option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings,
which only included the number of options pursuant to the grant that were exercised and left unexercised on the
transaction date.

63.    Furthermore, Company executives, including three of the Company's most highly compensated executives, were purportedly granted stock options on July 29, 1999 at an exercise price of $9.00.  The Company's stock price continued to rise until the end of the fiscal year, when Cirrus's stock rose to $20.88, *a 132.0% increase by the end of the fiscal year*.

**Fiscal Year 2000**



| Purported Grant Date | Name | Exercise Price | Number of Options[6] |
|---|---|---|---|
| 7/29/99 | French | $9.00 | 50,000 |
| | Swift | $9.00 | 37,500 |
| | Boudreau | $9.00 | 26,000 |
| | Dickinson | $9.00 | At least 15,000 |

---

[6] Where the total number of options is unknown, *i.e.*, where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

**Fiscal Year 2001 Option Grants[7]**

64.     During fiscal year 2001, the Individual Defendants purportedly granted options to Company executives, including three of the Company's most highly compensated executives, on April 3, 2000 at an exercise price of $16.69, which preceded a substantial rise in the Company's stock price over the remainder of the Fiscal Year, as demonstrated in the following graph:

**Fiscal Year 2001**



| Purported Grant Date | Name | Exercise Price | Number of Options[8] |
|---|---|---|---|
| 4/3/00 | Leeder | $16.69 | 50,000 |
| | Dickinson | $16.69 | 50,000 |
| | Fay | $16.69 | 20,000 |

---

[7] Fiscal year 2001 ended on March 31, 2001.

[8] Where the total number of options is unknown, *i.e.*, where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

| | Ensley | $16.69 | At least 100,000 |
|---|---|---|---|

65.     Furthermore, Defendant French was also awarded stock options backdated to May 24, 2000 at an exercise price of $16.13, which preceded that same substantial rise in the Company's stock price.  Indeed, ten trading days following the purported grant date, the price of Cirrus's stock increased to $19.38 – *a 20.1% increase*, as demonstrated in the following graph:

**Fiscal Year 2001**



| Purported Grant Date | Name | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|
| 5/24/00 | French | $16.13 | 150,000 |

66.     Defendant French also purportedly received a grant of stock options on October 2, 2000, at an exercise price of $32.56, one day before Company executives, including three of the Company's most highly compensated executives, received stock option grants also with an

exercise price of $32.56.[9]   These grants were dated to coincide with *Cirrus's lowest closing price of the entire month of October 2000*.   Indeed, ten trading days following the purported grant date of October 3, 2000, the price of Cirrus's stock increased to $38.75 – *a 19.0% increase*, as demonstrated in the following graph:

### October 2000



| Purported Grant Date | Name | Exercise Price | Number of Options[10] |
|---|---|---|---|
| 10/2/00 | French | $32.56 | 150,000 |
| 10/3/00 | Leeder | $32.56 | 25,000 |
| | Fay | $32.56 | 50,000 |

---

[9] In light of the fact that the stock price closed at $32.56 on October 3, 2000, while it closed at $39.75 on the prior day, in addition to being backdated, it also appears as though Defendant French's grant was misreported as having been made on October 2, 2000.  Additionally, Defendant French's Form 4 filed on December 11, 2000 represents that the grant was made on October 3, 2000.

[10] Where the total number of options is unknown, *i.e.*, where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

| | Carlson | $32.56 | 50,000 |
|---|---|---|---|
| | Dickinson | $32.56 | 25,000 |
| | Dille | $32.56 | At least 25,000 |
| | Jernigan | $32.56 | At least 40,000 |
| | Endsley | $32.56 | At least 3,000 |
| | Kromer | $32.56 | At least 25,000 |
| | Gray | $32.56 | At least 25,000 |
| | Essency | $32.56 | At least 30,000 |
| | Thompson | $32.56 | At least 5,000 |

### Fiscal Year 2002 Option Grants[11]

67.   Company executives were purportedly granted stock options on August 15, 2001 at an exercise price of $15.30.  This also constituted one of the lower prices of the stock for the first half of the Fiscal Year, prior to the September 11, 2001 tragedy as reflected in the following graph:

### Fiscal Year 2002



---

[11] Fiscal year 2002 ended March 30, 2002.

| Purported Grant Date | Name | Exercise Price | Number of Options[12] |
|---|---|---|---|
| 8/15/01 | French | $15.30 | 150,000 |
| | Leeder | $15.30 | 40,000 |
| | Ensley | $15.30 | 65,000 |
| | Kromer | $15.30 | 75,000 |
| | Jernigan | $15.30 | At least 7,000 |
| | Lucie | $15.30 | At least 10,000 |
| | Melanson | $15.30 | At least 7,000 |
| | Overly | $15.30 | At least 50,000 |
| | Thompson | $15.30 | At least 7,000 |
| | Essency | $15.30 | At least 7,250 |
| | Gray | $15.30 | At least 30,000 |

68.     Furthermore, Company executives were purportedly granted stock options on February 21, 2002 at an exercise price of $14.33, and Defendant French was purportedly granted stock options on February 27, 2002 at an exercise price of $15.99, both of which preceded a substantial rise in the Company's stock price.  Indeed, ten trading days following the purported grant date of February 21, 2002, the price of Cirrus stock increased to $18.91 – *a 32.0% increase*, and ten trading days following the purported grand date of February 27, 2002, the price of Cirrus stock increased to $18.86 – *a 17.9% increase*, as demonstrated in the following graph:

---

[12] Where the total number of options is unknown, *i.e.*, where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

**Twenty Trading Days Before and After 2/21/02**



| Purported Grant Date | Name | Exercise Price | Number of Options[13] |
|---|---|---|---|
| 2/21/02 | Leeder | $14.33 | 40,000 |
| | Ensley | $14.33 | 50,000 |
| | Kromer | $14.33 | 40,000 |
| | Lucie | $14.33 | At least 5,000 |
| 2/27/02 | French | $15.99 | 250,000 |

## Fiscal Year 2003 Option Grants[14]

69.    The Company's executives, including four of the Company's most highly compensated executives, received stock options purportedly granted on August 7, 2002 at an exercise price of $3.87. These grants were dated to coincide with *one of Cirrus's lowest closing*

---

[13] Where the total number of options is unknown, *i.e.*, where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

[14] Fiscal year 2003 ended March 29, 2003.

*prices of fiscal year 2003 preceding the enactment of the Sarbanes-Oxley Act of 2002 ("SOX")*

*on August 29, 2002*, which required almost immediate reporting of stock option grants, as

demonstrated in the following graph:

### March 31, 2002- August 31, 2002



| Purported Grant Date | Name | Exercise Price | Number of Options[15] |
|---|---|---|---|
| 8/7/02 | Leeder | $3.87 | 50,000 |
| | Overly | $3.87 | 50,000 |
| | Ensley | $3.87 | 50,000 |
| | Gray | $3.87 | 35,000 |
| | Rhode | $3.87 | At least 10,000 |
| | Lucie | $3.87 | At least 10,624 |

70.     The reason for the pattern set forth in the preceding paragraphs is that the

purported grant dates set forth therein were not the actual dates on which the stock option grants

---

[15] Where the total number of options is unknown, *i.e.*, where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

were made.  Rather, the Compensation Committee members, with the knowledge and approval of the other members of the Board, knowingly and deliberately contravened the 1996 Plan by backdating the stock option grants to make it appear as though the grants were made on dates when the market price of Cirrus stock was lower than the market price on the actual grant dates, thereby unduly benefiting the Option Recipient Defendants.  This improper backdating, which violated the terms of the 1996 Plan, resulted in option grants with lower exercise prices, which improperly increased the value of the options and improperly reduced the amounts the Option Recipient Defendants had to pay the Company upon exercise of the options.

71.     In addition, prior to the enactment of the SOX, the Individual Defendants were able to engage in backdating of option grants with relative ease because under federal law they were only required to report option grants to the SEC once a year.

72.     Pursuant to SOX, beginning on August 29, 2002, executives and directors were required to report option grants to the SEC within two days of the grant.  With this new two day reporting requirement in place, the pattern of backdating options seen previously from 1998 through 2002 came to an end, but remained hidden from the investing public through false reporting of financial  information in SEC filings by the Company as described below.

## Dissemination of False Financial Statements

73.     The Individual Defendants prepared, approved and/or signed Cirrus's annual and quarterly SEC reports during the relevant period.  The Individual Defendants knowingly and deliberately caused the Company to disseminate materially false and misleading statements in the periodic filings that the Individual Defendants prepared, approved, and/or signed.

74.     The Individual Defendants' secret option backdating scheme caused each of Cirrus's Forms 10-K, including Form 10-K405, for the relevant period to materially understate

Cirrus's compensation expense and materially overstate the Company's net income or materially understate its net loss, because the Individual Defendants failed to expense the "in-the-money" portion of Cirrus's stock option grants during the period as required by APB 25.

75.     As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants,

    a.    violated the terms of the 1996 Plan by granting stock options with exercise prices less than the fair market value of the stock on the actual date of grant;

    b.    violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

    c.    violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the 1996 Plan; and

    d.    produced and disseminated to Cirrus shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants, and thereby understated compensation expenses and overstated net income.

76.     The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K and Form 10-K405 filings:

    a.    Form 10-K405 for the year ended March 27, 1999, filed with the SEC on June 16, 1999 and signed by defendants Hackworth, Patil, French, Guzy, Rhines and Smith;

    b.    Form 10-K for the year ended March 25, 2000, filed with the SEC on June 23, 2000 and signed by defendants Hackworth, Patil, French, Fay, Guzy, Rhines and Smith;

    c.    Form 10-K for the year ended March 31, 2001, filed with the SEC on June 22, 2001 and signed by defendants Hackworth, French, Fay, Overly, Guzy, Patil, Rhines and Smith;

    d.    Form 10-K for the year ended March 30, 2002, filed with the SEC on June

19, 2002 and signed by defendants Hackworth, French, Overly, Guzy, Patil, Rhines, Sherman and Smith;

e.  Form 10-K for the year ended March 29, 2003, filed with the SEC on June 13, 2003 and signed by defendants Hackworth, French, Overly, Guzy, Patil, Rhines, Sherman and Smith;

f.  Form 10-K for the year ended March 27, 2004, filed with the SEC on June 9, 2004 and signed by defendants Hackworth, French, Guzy, Patil, Rhines, Sherman and Smith;

g.  Form 10-K for the year ended March 26, 2005, filed with the SEC on May 27, 2005 and signed by defendants Hackworth, French, Guzy, Patil, Rhines, Sherman and Smith; and

h.  Form 10-K for the year ended December 25, 2006, filed with the SEC on May 25, 2006 and signed by defendants Hackworth, French, Guzy, Patil, Rhines, Sherman and Smith.

77.  Specifically, in the Company's annual reports on Form 10-K and Form 10-K405 for fiscal years 1999 to 2003, the Individual Defendants caused Cirrus to falsely state that "[t]he Company applies Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees, and related interpretations in accounting for its plans."   Under APB 25, if the exercise price of the Company's stock options is not less than the market price of the underlying stock on the date of grant, no compensation expense is recognized.   Such statements were materially false and misleading in each of these years because Cirrus had granted stock options at prices that were below fair market value on the date of the grant and failed to account for the "in-the-money" options as required by APB 25.

78.  As alleged previously, APB 25 required the Individual Defendants to record compensation expense for options that were "in-the-money" on the date of grant.  However, they did not do so, thereby materially understating Cirrus's compensation expense and materially overstating Cirrus's net income or materially understating its net loss.  These statements were designed to conceal, and did in fact conceal, the fact that the Individual Defendants were

engaged in a continuous and systematic scheme of backdating stock option grants to Cirrus insiders in violation of state and federal laws.

79.     Additionally, Cirrus's materially false and misleading financial statements for fiscal years 1999 to 2003 were included in its Forms 10-K filed for subsequent fiscal years.  For this reason, and to the extent they included financials from earlier periods, Cirrus's annual reports on Form 10-K for fiscal years 2004 and 2005 were also materially false and misleading. By participating in the secret backdating scheme, and by reviewing and/or signing these subsequent annual reports, the Individual Defendants knew, or were reckless in not knowing, that the financial statements in these later filings were materially false and misleading.

80.     Furthermore, Defendant French also filed false Certifications of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "Certifications"), certifying that each Annual Report of Cirrus on Forms 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act"); and the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated."  Defendant French signed the following false Certifications:

    a.    for the Form 10-K for the year ended March 27, 2004, filed with the SEC on June 9, 2004;

    b.    for the Form 10-K for the year ended March 26, 2005, filed with the SEC on May 27, 2005; and

    c.    for the Form 10-K for the year ended March 25, 2006, filed with the SEC on May 25, 2006.

### Defendants' Concealment of Their Misconduct

81.     The Individual Defendants caused Cirrus to disseminate to shareholders proxy statements in connection with the Company's annual shareholder meetings and periodically for

special shareholder meetings during the relevant period. The Individual Defendants prepared and/or reviewed each proxy statement between 1999 and 2003. Moreover, they knew, or were deliberately reckless in not knowing, that the proxies were materially false and misleading.

82.     The Cirrus proxy statements that were disseminated to shareholders by the Individual Defendants annually in connection with annual shareholders' meeting typically concerned the election of directors, the approval and adoption of Cirrus's stock option plan and authorization to reserve shares for future issuance under the stock option plans, and ratification of the selection of Cirrus's auditor. Each proxy statement disseminated to shareholders during this period contained materially false and misleading disclosures or omitted information about Cirrus's stock option practices, as detailed above.

83.     From 1999 to 2003, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Option Recipient Defendants and falsely stated that the "exercise price of each option represents the market price of the Common Stock on the date of grant" as follows:

a.      Cirrus's proxy statement filed with the SEC on June 22, 1999 falsely reported that options granted to French, Josefczyk, Swanson, Donohue and Shelton were granted on October 8, 1998;

b.      Cirrus's proxy statement filed with the SEC on August 11, 2000 falsely reported that options granted to French, Swift and Patil were granted on June 3, 1999 and that options granted to French, Swift and Boudreau were granted on July 29, 1999;

c.      Cirrus's proxy statement filed with the SEC on July 25, 2001 falsely reported that options granted to Leeder, Dickinson and Fay were granted on April 3, 2000, that options granted to French were granted on May 24, 2000, that options granted to French were granted on October 2, 2000 and that options granted to Leeder, Dickinson, Fay and Carlson were granted on October 3, 2000;

d.    Cirrus's proxy statement filed with the SEC on June 19, 2002 falsely reported that options granted to French, Leeder, Ensley and Kromer were granted on August 15, 2001, that options granted to Leeder, Ensley and Kromer were granted on February 21, 2002 and that options granted to French were granted on February 27, 2002; and

e.    Cirrus's proxy statement filed with the SEC on June 16, 2003 falsely reported that options granted to Leeder, Overly, Ensley and Gray were granted on August 7, 2002.

84.    From 1999 to 2006, Cirrus, with the knowledge, approval an participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, filed with the SEC Form 4s that falsely reported the dates of stock option grants to the Option Recipient Defendants, as follows:

a.    Donohue's Form 4 filed with the SEC on May 13, 1999 falsely reported that options granted to Donohue had been granted on October 8, 1998;

b.    Swift's Form 4 filed with the SEC on March 14, 2000 falsely reported that options granted to Swift had been granted on June 3, 1999;

c.    Dickinson's Form 4 filed with the SEC on June 15, 2000 falsely reported that options granted to Dickinson had been granted on October 8, 1998, June 3, 1999 and July 29, 1999;

d.    Gray's Form 4 filed with the SEC on September 19, 2000 falsely reported that options granted to Gray had been granted on June 3, 1999;

e.    Cheney's Form 4 filed with the SEC on October 10, 2000 falsely reported that options granted to Cheney had been granted on June 3, 1999;

f.    Leeder's Form 4 filed with the SEC on October 12, 2000 falsely reported that options granted to Leeder had been granted on April 3, 2000;

g.    Boudreau's Form 4 filed with the SEC on November 8, 2000 falsely reported that options granted to Boudreau had been granted on June 3, 1999;

h.    Kromer's Form 4 filed with the SEC on December 4, 2000 falsely reported that options granted to Kromer had been granted on October 3, 2000;

i.    Endsley's Form 4 filed with the SEC on December 8, 2000 falsely reported that options granted to Endsley had been granted on October 3,

2000;

j.    Fay's Form 4 filed with the SEC on December 8, 2000 falsely reported that options granted to Fay had been granted on April 3, 2000 and October 3, 2000;

k.    Thompson's Form 4 filed with the SEC on December 8, 2000 falsely reported that options granted to Thompson had been granted on October 3, 2000;

l.    Carlson's Form 4 filed with the SEC on December 11, 2000 falsely reported that options granted to Carlson had been granted on October 3, 2000;

m.    Dickinson's Form 4 filed with the SEC on December 11, 2000 falsely reported that options granted to Dickinson had been granted on October 8, 1998, April 3, 2000 and October 3, 2000;

n.    Ensley's Form 4 filed with the SEC on December 11, 2000 falsely reported that options granted to Ensley had been granted on April 3, 2000 and October 3, 2000;

o.    Essency's Form 4 filed with the SEC on December 11, 2000 falsely reported that options granted to Essency had been granted on October 3, 2000;

p.    French's Form 4 filed with the SEC on December 11, 2000 falsely reported that options granted to French had been granted on May 25, 2000 and October 3, 2000;

q.    Gray's Form 4 filed with the SEC on December 11, 2000 falsely reported that options granted to Gray had been granted on October 3, 2000;

r.    Leeder's Form 4 filed with the SEC on December 11, 2000 falsely reported that options granted to Leeder had been granted on October 3, 2000;

s.    Jernigan's Form 4 filed with the SEC on December 13, 2000 falsely reported that options granted to Jernigan had been granted on October 3, 2000;

t.    Dille's Form 4 filed with the SEC on January 17, 2001 falsely reported that options granted to Dille had been granted on October 3, 2000;

u.    Gray's Form 4 filed with the SEC on October 10, 2001 falsely reported

that options granted to Gray had been granted on August 15, 2001;

v.     Ensley's Form 4 filed with the SEC on November 19, 2001 falsely reported that options granted to Ensley had been granted on August 15, 2001;

w.    Essency's Form 4 filed with the SEC on November 19, 2001 falsely reported that options granted to Essency had been granted on August 15, 2001;

x.     Leeder's Form 4 filed with the SEC on November 19, 2001 falsely reported that options granted to Leeder had been granted on August 15, 2001;

y.     Melanson's Form 4 filed with the SEC on November 19, 2001 falsely reported that options granted to Melanson had been granted on August 15, 2001;

z.     Overly's Form 4 filed with the SEC on November 19, 2001 falsely reported that options granted to Overly had been granted on August 15, 2001;

aa.    Thompson's Form 4 filed with the SEC on November 19, 2001 falsely reported that options granted to Thompson had been granted on August 15, 2001;

bb.    French's Form 4 filed with the SEC on November 20, 2001 falsely reported that options granted to French had been granted on August 15, 2001;

cc.    Lucie's Form 4 filed with the SEC on November 20, 2001 falsely reported that options granted to Lucie had been granted on August 15, 2001;

dd.    Jernigan's Form 4 filed with the SEC on November 28, 2001 falsely reported that options granted to Jernigan had been granted on August 15, 2001;

ee.    Perry 's Form 4 filed with the SEC on March 11, 2002 falsely reported that options granted to Perry  had been granted on June 3, 1999;

ff.     Carlson's Form 4 filed with the SEC on May 15, 2002 falsely reported that options granted to Carlson had been granted on October 3, 2000;

gg.    Lucie's Form 4 filed with the SEC on September 9, 2002 falsely reported that options granted to Lucie had been granted on August 7, 2002;

hh.   Gray's Form 4 filed with the SEC on September 9, 2002 falsely reported that options granted to Gray had been granted on August 7, 2002;

ii.   Lucie's Form 4 filed with the SEC on October 28, 2003 falsely reported that options granted to Lucie had been granted on February 21, 2002 and August 7, 2002;

jj.   Lucie's Form 4 filed with the SEC on November 26, 2003 falsely reported that options granted to Lucie had been granted on August 7, 2002;

kk.   Rhode's Form 4 filed with the SEC on March 27, 2006 falsely reported that options granted to Rhode had been granted on August 7, 2002;

ll.   Gray's Form 4 filed with the SEC on May 4, 2006 falsely reported that options granted to Gray had been granted on August 7, 2002;

mm.   Rhode's Form 4 filed with the SEC on May 4, 2006 falsely reported that options granted to Rhode had been granted on August 7, 2002; and

nn.   Leeder's Form 4 filed with the SEC on May 8, 2006 falsely reported that options granted to Leeder had been granted on August 15, 2001 and February 21, 2002.

## CIRRUS'S FALSE FINANCIAL REPORTING
## IN VIOLATION OF GAAP

85.   As a result of the Individual Defendants' improper backdating of stock options, the Individual Defendants caused Cirrus to violate GAAP, SEC regulations and Internal Revenue Service ("IRS") rules and regulations.

86.   Cirrus's financial results for fiscal 1999 through fiscal 2003 were included in reports filed with the SEC and in other shareholder reports.  In these reports, the Individual Defendants represented that Cirrus's financial results were presented in a fair manner and in accordance with GAAP.

87.   The Individual Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial

condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

88.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

### Violations of GAAP

89.     During the relevant period, the Individual Defendants caused the Company to understate its compensation expense by not properly accounting for its stock options under GAAP and thus overstating the Company's net earnings.

90.     Under well-settled accounting principles in effect throughout the relevant period, Cirrus did not need to record an expense for options granted to employees at the current market price ("at-the-money"). The Company was, however, required to record an expense in its financial statements for any options granted below the current market price ("in-the-money").  In order to provide Cirrus executives and employees with far more lucrative "in-the-money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), the Individual Defendants systematically falsified Company records to create the false appearance that options had been granted at the market price on an earlier date.

91.     Throughout the relevant period, Cirrus accounted for stock options using the intrinsic method described in APB No. 25, "Accounting for Stock Issued to Employees."  Under

APB No. 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is "in-the-money" on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are "at-the-money" or "out-of-the-money" on the measurement date need not be expensed. Excluding non-employee directors, APB No. 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were "in-the-money" or not on the date of grant.

### Cirrus's GAAP Violations Were Material

92.     Cirrus's false and misleading relevant period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality. SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality. Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important." It also stresses that materiality requires qualitative, as well as quantitative, considerations. For example, if a known misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.

93.     SAB Topic 1M further states:

> among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –
>
> *        *        *
>
> whether the misstatement masks a change in earnings or other trends
>
> whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
>
> *        *        *

whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

94.     SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

95.     Cirrus's misstatements satisfy these criteria and thus were material from both a quantitative and qualitative perspective.  Notably, the Company has already announced that it intends to restate its financial results to include an additional *$22 to $24 million* in additional compensation expenses.

**Cirrus's Financial Statements Violated Fundamental Concepts of GAAP**

96.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

97.    Further, the undisclosed adverse information concealed by the Individual Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### Cirrus's Financial Statements Violated SEC Regulations

98.    During the relevant period, the Individual Defendants caused Cirrus to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

99.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers – the Company's CEO and its next four most highly paid executives. Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year. In the summary compensation table, the issuer must identify in a column "other annual compensation" received

by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period.   Item 402(b)(2)(iii)(C)(2).   In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options. . . . If such exercise or base price is less than the market price of the underlying security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant. . . ."   Item 402(c)(2)(iv).

100.    The Individual Defendants caused Cirrus to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted options with exercise prices below the market value on the date the Board or Compensation Committee approved the grant.

### Violations of IRS Rules and Regulations

101.    During the relevant period, the Individual Defendants further caused Cirrus to violate IRS rules and regulations due to its improper accounting for the backdated stock options. As a result, the Company's tax liabilities were understated, exposing Cirrus to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

102.    The Individual Defendants caused the Company to violate Section 162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based." In order for compensation to be performance-based, the Compensation Committee must have set pre-established and objective performance goals.   The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the

grant.  Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

103.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance.  This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

104.    The Individual Defendants caused Cirrus to violate Section 162(m) by providing backdated options to the Company's named executive officers, which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant.  As a result all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

105.    The Individual Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and Federal Insurance Compensation Act ("FICA") tax from its executives and employees upon the exercise of Cirrus's stock options by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock Options ("ISOs").

106.    ISOs are a form of equity compensation that may be provided to a company's employees.  ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment as

they are not subject to income tax upon exercise of the options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of exercise). Stock options that do not qualify as ISOs are considered to be NSOs. NSOs are not entitled to preferential treatment as they are subject to income tax and FICA tax withholding upon exercise. As a result, a company that fails to withhold income tax and/or FICA tax upon the exercise of NSOs by its employees would be liable for the amount of the income tax and FICA tax that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

107.   By improperly treating its backdated options as ISOs, the Individual Defendants failed to provide proper income tax and FICA tax withholdings upon the exercise of its options by its executives and employees in violation of IRS rules and regulations.

108.   The chart below illustrates Cirrus's false and misleading fiscal financial results which materially understated its compensation expenses and thus overstated its earnings or understated its losses:

| Fiscal Year | Reported Earnings (Loss) | Reported Basic Earnings (Loss) Per Share |
|---|---|---|
| 1999 | ($427,403,000) | ($6.77) |
| 2000 | ($47,096,000) | ($0.77) |
| 2001 | $143,176,000 | $2.00 |
| 2002 | ($235,071,000) | ($2.66) |
| 2003 | ($197,761,000 | ($2.37) |
| 2004 | $46,503,000 | $0.55 |
| 2005 | ($13,388,000) | ($0.16) |
| 2006 | $54,145,000 | $0.63 |

## INDIVIDUAL DEFENDANTS' INSIDER SELLING

109.   From 1999 through 2006, certain of the Individual Defendants, while in

possession of materially adverse non-public information regarding the backdating of stock options and the false financial statements resulting therefrom, sold more than $56 million in Cirrus stock, as summarized, below:

| NAME | NUMBER OF SHARES DISPOSED | GROSS PROCEEDS |
|---|---|---|
| Boudreau | 28,236 | $1,304,131.52 |
| Carlson | 25,000 | $75,000.00 |
| Cheney | 4,336 | $88,888.00 |
| Dickinson | 133,558 | $3,750,441.95 |
| Donohue | 63,331 | $646,423.75 |
| Ensley | 45,400 | $424,017.88 |
| Fay | 11,000 | $182,327.00 |
| French | 569,839 | $4,054,369.23 |
| Gray | 76,350 | $755,605.92 |
| Hackworth | 893,670 | $26,186,471.20 |
| Kromer | 35,000 | $325,225.00 |
| Leeder | 76,900 | $799,134.80 |
| Lucie | 6,000 | $49,724.81 |
| Overly | 34,500 | $148,966.92 |
| Patil | 408,257 | $15,657,150.00 |
| Perry | 32,887 | $519,191.47 |
| Rhines | 25,000 | $568,450.00 |
| Rhode | 10,000 | $92,502.04 |
| Smith | 18,958 | $882,115.74 |
| Thompson | 11,497 | $224,735.85 |
| **TOTAL** | **2,509,719** | **$56,734,873.07** |

## DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

110.    In a misguided effort to attract and retain employees in a competitive environment, the Individual Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme.  The Individual Defendants' misconduct was unjustifiable and constituted a gross breach of their fiduciary duties by:

      a.      colluding with each other to backdate stock option grants;

      b.      colluding with each other to violate GAAP and Section 162(m);

      c.      colluding with each other to produce and disseminate to Cirrus shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

      d.      colluding with each other to file false proxy statements and false financial statements in order to conceal the improper backdating of stock options.

111.    The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Option Recipient Defendants at the expense of the Company.

112.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company is required to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant, and costs and expenses incurred in connection with the Company's internal investigation and the SEC investigation of the Company.

113.    On May 26, 2006, *Forbes*, in an article titled, "The Next Big Scandal," quoted former SEC Chairman Harvey L. Pitt, saying "[w]hat's so terrible about backdating options grants? For one thing, it likely renders a company's proxy materials false and misleading. Proxies typically indicate that options are granted at fair market value. But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

114.   On June 18, 2006, in an article titled, "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here' . . . It's a question of knowingly betting on a race that's already been run."

115.   On July 22, 2006, *The San Francisco Chronicle* recounted SEC Chairman Christopher Cox's announcement in San Francisco on July 20, 2006 where he said, "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. . . . It is securities fraud if you falsify books and records.  It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted accounting principles.  There is no requirement that (the defendant) personally profit [to prove that a crime occurred.]"

116.   On September 6, 2006, MarketWatch, in an article titled "SEC Probing more than 100 firms on options: Cox," quoted the Chairman of the United States Senate Banking, Housing and Urban Affairs Committee ("Senate Banking Committee"), Senator Richard Shelby, saying that manipulation of options grant dates "appears to be a ***black-and-white example of securities fraud***," (emphasis added) and "[c]orporate officers and directors engaging in this practice are cheating the owners of the company and should be held accountable to the fullest extent possible."

117.   Shortly thereafter, on September 6, 2006, the United States Senate Committee on Finance ("Finance Committee") held a hearing on "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits." At the hearing, the Chairman of the Committee, Senator Chuck Grassley, in his opening statement,